1  YATES LAW FIRM, LLC
   Phillip J. Frazee, Bar No. 220372
2  pfrazee@yateslawfirmllc.com
   5020 Campus Drive
3  Newport Beach, California  92660
   Telephone:  (949) 296-7005; Facsimile:  (760) 994-0087
4
   Russell E. Yates, (Admitted *Pro Hac Vice*)
5  ryates@yateslawfirmllc.com
   1900 Wazee Street, Suite 203
6  Denver, Colorado 80202
   Telephone: (303) 722-2810; Facsimile: (303) 722-2890
7  Attorneys for Plaintiff Matrix Business Consulting, Inc.

8              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
9                  WESTERN DIVISION

10 MATRIX BUSINESS CONSULTING,        )
   INC.,                              )
11                                    )  CASE NO. CV08-01036 GW (CWx)
                      Plaintiff,      )
12                                    )
   vs.                                )  **MATRIX BUSINESS CONSULTING,**
13                                    )  **INC.'S MEMORANDUM OF**
   BOB BARTON, an individual, BARTON  )  **APPLICABLE LAW**
14 ADJUSTING, INC. d/b/a BARTON       )
   CONSULTING, GATEWAY FASHION        )
15 MALL, L.L.C., SCHULER & BROWN,     )
   DANIEL E. HOFFMAN, an individual, and )
16 JACK M. SCHULER, an individual,    )  TRIAL DATE:    November 5, 2009
                                      )  TIME:          8:30 a.m.
17                    Defendants.     )  DEPT:          Courtroom 10

18      Plaintiff, MATRIX BUSINESS CONSULTING, INC. ("Matrix"), by and through its

19 counsel, Yates Law Firm, L.L.C., and pursuant to this Court's Civil minutes Order of September

20 29, 2009, hereby submits its Memorandum of Applicable Law as follows:

21              **THE PARTIES AND CLAIMS**

22      Plaintiff, Matrix Business Consulting, Inc, ("Matrix") brought this lawsuit in the Federal

23 District Court for the Central District of California against Bob Barton, Barton Adjusting, Inc.

24

25                        1

1  (collectively "Barton"), Gateway Fashion Mall, L.L.C. ("Gateway"), Schuler & Brown ("Schuler

2  & Brown"), Daniel Hoffman ("Hoffman"), and Jack Schuler ("Schuler") (collectively "Schuler

3  & Brown Defendants").  Matrix's principal owner and participant in this matter is Scott deLuise.

4  Gateway's principal owner and participant in this matter is Raymond Arjmand.  Matrix's

5  remaining claims in this action are against Gateway for breach of contract, declaratory relief,

6  breach of implied contract, and quantum meruit.

7  **FACTUAL BACKGROUND**

8  On July 21, 2005, a hail storm ("Hail Storm") occurred in Bismarck, North Dakota which

9  caused substantial damage to the Gateway Fashion Mall (the "Bismarck Mall").  At the time of

10  the Hail Storm, the Mall was owned by V.P. Investments, L.L.C.  V.P. Investments and the

11  Bismarck Mall were insured through a commercial property insurance policy (the "Policy")

12  issued by Lexington Insurance Company ("Lexington") and Allied World Assurance Company,

13  Inc ("Allied") to V.P. Investments and its parent company, Triple Net Properties, LLC.  See

14  Exhibit 2; Exhibit 3, pg. 12; and Exhibit B, Gateway Rule 30(b)(6) Deposition, pg. 33,ln.16-

15  pg.34,ln.9.    Because two insurers were on the loss, all payments were divided between the

16  insurers based on a 75% share to Lexington and a 25% share to Allied.  See Exhibit A, Frederick

17  Deposition, pg. 25, lns.11- pg. 26, ln.7.  Mr. Arjmand first contacted Mr. deLuise to perform

18  public adjusting services for the Bismarck Mall before Gateway even owned the mall, and Mr.

19  Arjmand informed Mr. deLuise that he wanted to hire Mr. deLuise because Mr. deLuise was

20  licensed as an insurance consultant in North Dakota and Mr. Arjmand was not so licensed. [1]  See

21  deLuise Declaration, ¶¶ 3&4; Exhibit B, Gateway Rule 30(b)(6) Deposition, pg. 36,ln.24-pg.37,

22

23  [1] The terms "insurance consultant" and "public adjuster" are used interchangeably as they mean the same thing,
    however, the different terms are used depending on the State.

24

25  2

1    ln. 13.  Mr. deLuise informed Mr. Arjmand that until Mr. Arjmand purchased the mall and

2    received an assignment from V.P. Investments, he could not represent Gateway for the insurance

3    claim because Gateway would not have any claim under the applicable insurance policy.  See

4    deLuise Declaration, ¶4.

5          On our around April 24, 2006, Matrix was hired by V.P. Investments as an insurance

6    consultant to assist in adjusting and submitting the insurance claim for the damage caused to the

7    Bismarck Mall. See Exhibit 3, pg.2-3, V.P. Investments Agreement.  During this time period,

8    Gateway also entered into a contract to purchase the Mall from V.P. Investments, which included

9    the rights to all money paid under the insurance policy for damage to the Mall caused by the Hail

10   Storm.  See Exhibit 3, pg.5-6, Assignment of Insurance Proceeds to Gateway.  Gateway also

11   signed the V.P. Investments Agreement between V.P. Investments and Matrix for Matrix to act

12   as the public adjuster for the loss.  See Exhibit 3, pg.2-3, V.P. Investments Agreement.  Pursuant

13   to the V.P. Investments Agreement, Matrix was to be paid ten percent (10%) of all amounts

14   recovered by V.P. Investments and Gateway from any insurance carrier for damages sustained

15   by the Mall.

16         For the next several months experts and consultants were retained on behalf of Gateway

17   to investigate the damage to the Mall and in order to prepare estimates to be used for submitting

18   a claim to the insurers.  Based on various investigations and estimates, Matrix prepared and

19   submitted partial proofs of loss and claims for various types of damages documented at the Mall,

20   including damages to the roof and HVAC units.  However, because V.P. Investments was not

21   cooperating completely with signing the proofs of loss and approving the claimed damages,

22   many delays were experienced which hindered the claim process.  In addition, it was also an

23   extremely dry year in Bismarck, North Dakota and much of the hidden roof damage could not be

24

25

identified easily by witnessing roof leaks and interior water damage.   Exhibit D, Barton Deposition, pg.18,ln.11-pg. 19, ln.23; pg.24,ln.21-pg.25,ln.4.   Lastly, there were indications that V.P. Investments may have been aware of interior water damage from roof leaks but painted over the interior damage and installed new ceiling tiles to cover-up the interior damage and conceal the damage from Gateway during the sale of the property.  Exhibit D, Barton Deposition, pg.13,ln.18- pg.14,ln.2.

In or around November 2006, Barton got involved in order to assist in rendering opinions as to roof damage, hidden interior water and mold damage, and construction consulting.  On or around December 18, 2006, Gateway, Matrix, and Barton entered into a contract and fee agreement between the parties pertaining to the adjustment, submission of an insurance claim, and recovery of insurance proceeds for damages sustained by the Mall, which attached the original agreement between Matrix and V.P. Investments and the assignment to Gateway.  See Exhibit  63, First Joint Consulting Agreement.  It provided that any insurance proceeds paid by any insurance company for damages to the Mall arising out of the Hail Storm would be paid to the law firm of Schuler & Brown's Trust Account and that Schuler & Brown would disburse the proceeds in accordance with the terms of the agreement.  See Exhibit 63, First Joint Consulting Agreement.  It further provided that in the event legal services were required in connection with the insurance claim, the law firm of Schuler & Brown would be retained to assist and Barton would be responsible for 50% of Schuler & Brown's legal fees and Matrix would be responsible for 50% of Schuler & Brown's legal fees.  See Exhibit 63, First Joint Consulting Agreement. Around this same time, Gateway, through its main principal, Raymond Arjmand, started getting its attorneys, Schuler & Brown, more heavily involved in the loss.  In fact, Dan Hoffman from Schuler & Brown drafted the First Joint Consulting Agreement for the parties.  Exhibit C, Matrix

Rule 30(b)(6) Deposition, pg. 67, ln.19- pg.68,ln.9.  On January 24, 2007, Matrix finalized and submitted a claim to AIG, the adjusters for the insurers Lexington and Allied, for the Mall loss in the amount of $12,508,420.15.  See Exhibit 4, Matrix Claim Letter and Statement of Loss.  This claim presentation consisted of approximately 2,200 pages of letters, statement of loss, proof of loss, reports, data, photos, estimates, and other documents.  See Exhibit 4, Matrix Claim Letter and Statement of Loss (most of the 2,200 pages are excluded from this exhibit out of necessity).

During the Spring and Summer of 2007, numerous meetings were held at the Bismarck Mall with consultants, experts, insurance adjusters and their consultants, and the parties in order to further investigate the damage to the mall and continue the adjustment process.  In addition, disagreements between Schuler & Brown and Matrix developed as to how to handle the claim, how to push the adjustment forward with AIG, and how the insurance proceeds were to be received, handled, and distributed, as well as how the Schuler & Brown legal fees should be billed and paid by Barton and Matrix.  Exhibit 69, Feb. 28, 2007, E-mail from deLuise to Hoffman.  In addition, Hoffman told the insurers that Schuler & Brown was representing Gateway and that Matrix would no longer be involved as Gateway's representative.  See Exhibit 70, March 9, 2007 Letter from Frederick, ¶ 1.  Even though Matrix had prepared and submitted the $12.5 million claim in January 2007, Schuler & Brown started taking over the adjusting duties of Matrix and relegated Matrix to the sidelines, even so much as to not inform Matrix of meetings and site visits at the Mall with experts and the insurance adjusters.

On or around June 6, 2007, Gateway, Matrix, and Barton entered into a second contract and fee agreement between the parties in order to clarify how payment was to be made to Matrix. See Exhibit 24, Second Joint Consulting Agreement.  It was clarified that the ten percent (10%) fee Matrix was entitled to was ten percent of the total of any recovered insurance proceeds in

excess of $2,000,000, but was to be paid by Barton out of his twenty-five percent (25%) fee which Barton was to receive from Gateway.  See Exhibit 24, Second Joint Consulting Agreement.  The remainder of the agreement stayed largely unchanged.  At deposition, however, Mr. Arjmand testified that even though he had been dissatisfied with Matrix's performance for months prior to signing the Second Joint Consulting Agreement in June 2007, he signed the agreement "as a courtesy to [Mr. Barton]."  Exhibit B, Gateway Rule 30(b)(6) Deposition pg.122, ln.23-pg.123,ln.23.  Again, Schuler & Brown, drafted the agreement.  Exhibit C, Matrix Rule 30(b)(6) Deposition, pg. 125, ln.24-pg.126, ln.14.

On or around July 3, 2007, a dispute arose between Matrix and Gateway regarding the payment of $24,542.37 that Gateway owed Matrix under the Second Joint Consulting Agreement for Matrix's 7% fee of the first $2,000,000 of insurance proceeds paid by the insurers.  From this point forward, Matrix would be entitled to 10% of all insurance proceeds recovered after the first $2,000,000.  Because Gateway was threatening to fire Matrix and Matrix knew that additional funds above the first $2,000,000 had been agreed upon at meetings with the insurers and were going to be paid by the insurers in the near future, Matrix agreed that it would not pursue collection of the $24,542.37 fee in exchange for Gateway's agreement to continue to abide by the Second Joint Consulting Agreement and an agreement not to fire Matrix.

Soon thereafter, on August 28, 2007, the Schuler & Brown Defendants, on behalf of Gateway, informed Matrix that its services were no longer required on the loss.  See Exhibit 71, August 28, 2007, Letter.  Also, on August 28, 2007, AIG Report No. 8 requested an additional payment in the amount of $361,064.54 for Lexington's 75% share of a new total approved building claim of $2,889,551.29, as of that date.  See Exhibit 13, AIG 8th Report, pg. 4 of 5 and Statement of Loss (Bates No. AIG 001375).  Thus, at the same time Gateway informed Mr.

deLuise his services were no longer required, Matrix was entitled to $88,955.13, which was 10% of the $889,551.29 amount over $2 million. This was never paid to Matrix. Just nine days later, on September 6, 2007, AIG requested an additional $1,125,000 for its 75% share of a total additional agreed amount owed for mold remediation totaling $1,500,000. See Exhibit 14, AIG 9th Report, pg. 2 of 4. Thus, the total claim as approved by the insurers on September 6, 2007, was $4,389,551.29, of which Matrix's 10% fee would have been $238,955.13. See Exhibit 14, AIG 9th Report, Statement of Loss (AIG 001347). This was never paid to Matrix. Moreover, Mr. Frederick, the AIG claims adjuster, testified that the agreement for the mold remediation was reached sometime earlier in the summer, prior to his request for the payment, and, in fact, AIG's attorneys sent a draft of the Mold Settlement Agreement to Mr. Hoffman on July 31, 2007, and Mr. Hoffman confirmed that the mold remediation payment would be approximately $1.65 million. See Exhibit A, Frederick Deposition, pg.84,ln.15 – pg.87,ln.10; Exhibit 7, July 31, 2007, E-mail from Hoffman. Mr. Frederick further testified that he didn't recall anything happening between his August 28 and September 6 reports and that no new information was provided during the time period between the two reports. Exhibit A, Frederick Deposition pg.124, ln.21- pg.125, ln.4. Thus, even though AIG had not officially requested the payment for the mold remediation until September 6, 2007, nine days after the Gateway letter, AIG had agreed to the protocol for the mold remediation, AIG's attorneys had drafted the Mold Settlement Agreement and forwarded it to Schuler & Brown, and AIG had agreed to the estimate of $1,500,000 for mold remediation all prior to Matrix being wrongfully terminated by Gateway. On or around September 13, 2007, Barton notified Matrix that he believed Matrix had breached the contract between the parties by refusing to pay the legal fees of Schuler & Brown and, therefore, Barton was considering Matrix's actions as an anticipatory breach and was considering

1  the contract to be null and void. See Exhibit 100, September 13, 2007, Barton E-mail. However,

2  in his deposition, Mr. Barton testified that this e-mail was essentially written by Schuler &

3  Brown attorneys and Barton was essentially forced to send it to Matrix. Exhibit D, Barton

4  Deposition pg.122, ln.7-18.

5  From August 28, 2007, until a final settlement was reached during a meeting on February

6  27, 2008, no further agreements were made regarding the damages and no further payments were

7  agreed to or requested by the insurers. During the February 27, 2008, meeting, Mr. Arjmand of

8  Gateway refused to provide any further documentation other than a report prepared by Barton

9  which purported to document a new claim number of over $23 million dollars. See Exhibit A,

10  Frederick Deposition, pg. 152, ln.24 – pg. 154, ln.22. In his 11th Report for AIG, Mr. Frederick

11  noted that he "found the [new] loss figures to be so exaggerated that we did not believe there was

12  any point in having further discussion." See Exhibit 21, AIG 11th Report, pg. 4 of 5. However,

13  before leaving the meeting, Hoffman suggested that Gateway would consider settling the entire

14  loss for $8 million so Mr. Frederick did not leave, but instead, the parties reached a tentative

15  settlement agreement of all claims in the amount of $7,250,000. Thus, although Barton

16  presented a new claim in excess of $23 million dollars, it was not relied upon by AIG in settling

17  the loss. See Exhibit A, Frederick Deposition, pg. 169, lns.5-10. Matrix's previous claim in

18  January 2007 and all the work Matrix and the consultants had done prior to Matrix being

19  terminated was the basis for settling the claim.

20  What essentially has happened is that Matrix worked diligently for over 1 ½ years as an

21  insurance consultant, submitted the claim to AIG with backup in the amount of $12.5 million in

22  January 2007, then was slowly squeezed out of the loss adjustment meetings, discussions, and

23  settlements discussions by Gateway's attorneys, Schuler & Brown, and, just prior to over $2.4

24

25

million in payments being received by Gateway, Matrix was informed that Gateway no longer needed Matrix's services so that Gateway would not have to pay Matrix 10% of the $2.4 million payments. Then, when a final settlement was reached only a few months later, again based upon the lion's share of work performed by Matrix, Gateway again refused to pay Matrix its 10% fee of the remainder $2.866 million. Then, only after Matrix filed suit in this matter on February 14, 2008, did Mr. Arjmand of Gateway file a complaint with the California Department of Insurance on March 14, 2008, complaining of Matrix's services for the Bismarck Mall loss. See Exhibit 95. Mr. deLuise was contacted by investigators of the California Department of Insurance and provided them with all the information and documents they requested. See deLuise Declaration, ¶¶ 6 & 7. On about October 6, 2009, Mr. deLuise received a letter from the California Department of Insurance indicating that the department had determined that it did not have jurisdiction over the contracts and fee agreements between Matrix and Gateway in this matter because the property that sustained the loss and was the subject matter of the dispute was located in North Dakota and that the State of North Dakota would have jurisdiction over the public adjusting activities. See deLuise Declaration, ¶ 8; Exhibit F, California Department of Insurance Letter.

## **LEGAL ANALYSIS**

Gateway has asserted that the California Public Insurance Adjusters Act, California Insurance Code section 15000, et. seq. ("CPIAA"), should apply to this case because Gateway is a California business. California Insurance Code section 15600 states as follows:

> (a) No person shall engage in a business regulated by this chapter, or act or assume to act as, or represent himself or herself to be, a licensee unless he or she is licensed under this chapter. Any person who violates this subdivision shall, in addition to any other penalties provided by law, be liable to the state for a civil penalty in an amount not exceeding ten thousand dollars ($10,000), or if that violation is willful, in an amount not exceeding twenty-five thousand dollars

1    ($25,000). The penalty shall be assessed and recovered in a civil action brought by
2    the commissioner in a court of competent jurisdiction in the name of the people of
     the State of California.

3    (b) Any contract for services regulated by this chapter that is entered into by **an
4    insured** with any person who is in violation of subdivision (a) may be voided at
     the option of the insured, and the insured shall not be liable for the payment of any
     past services rendered, or future services to be rendered, by that person under that
5    contract or otherwise. (emphasis added)

6    Cal. Ins. Code, §15600.

7    Thus, Gateway has suggested that because the business entity Matrix Business Consulting, Inc.

8    does not have a public insurance adjusters license in California, Gateway may void the contract

9    between Matrix and Gateway in this matter and that Gateway is not liable for the payment of any

10   past services rendered by Matrix pursuant to the contract.   This argument, however, fails for

11   numerous reasons.

12       **1.   Gateway Is Not an Insured Under the California Public Insurance Adjusters Act**

13       The applicable principles of statutory construction are well settled that when a court

14   construes a statute, the court must determine and effectuate the legislative intent. <u>Woods v.</u>

15   <u>Young</u>, 53 Cal.3d 315, 323, 279 Cal.Rptr. 613, 807 P.2d 455 (1991).  In order to determine the

16   legislative intent, this Court must first look to the words of the statute and give them their usual

17   and ordinary meaning.  <u>DaFonte v. Up-Right, Inc.</u>, 2 Cal.4th 593, 601, 7 Cal.Rptr.2d 238, 828

18   P.2d 140 (1992).  If there is no ambiguity in the language of the statute, then the Legislature is

19   presumed to have meant what it said, and the plain meaning of the language governs.  <u>Kizer v.</u>

20   <u>Hanna</u>, 48 Cal.3d 1, 8, 255 Cal.Rptr. 412, 767 P.2d 679 (1989).  Where a statute is clear, courts

21   should not interpret away clear language in favor of an ambiguity that does not exist. <u>Hartford</u>

22   <u>Fire Ins. Co. v. Macri</u>, 4 Cal.4th 318, 326, 14 Cal.Rptr.2d 813, 842 P.2d 112 (1992).  The

23   California Supreme Court has stated:

24

25                                            10

> Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.] (Hunt v. Superior Court (1999) 21 Cal.4th 984, 1000, 90 Cal.Rptr.2d 236, 987 P.2d 705.)   If the Legislature has provided an express definition of a term, that definition ordinarily is binding on the courts. (Adoption of Kelsey S. (1992) 1 Cal.4th 816, 826, 4 Cal.Rptr.2d 615, 823 P.2d 1216; ***756 People v. Dillon (1983) 34 Cal.3d 441, 468, 194 Cal.Rptr. 390, 668 P.2d 697.) Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose. (DuBois v. Workers' Comp. Appeals Bd. (1993) 5 Cal.4th 382, 388, 20 Cal.Rptr.2d 523, 853 P.2d 978.)

Curle v. Superior Court, 24 Cal.4th 1057, 1063, 16 P.3d 166, 170, 103 Cal.Rptr.2d 751, 755 - 756 (Cal. 2001).

Since the Legislature has not provided an express definition of the term "insured" in the CPIAA, the common meaning of the word should be applied by this Court when interpreting the CPIAA within the context of the entire statutory scheme in pursuance of the legislative purpose. The common meaning of the word "insured" is clearly the entity or entities named in the applicable policy of insurance as the "insured."   Numerous cases look to the definition of "insured" in the applicable policy to determine this.   See First American Title Ins. Co. v. XWarehouse Lending Corp. 177 Cal.App.4th 106, 114, 98 Cal.Rptr.3d 801, 807 (Cal.App. 2009); Taub v. First State Ins. Co., 44 Cal.App.4th 811, 818, 52 Cal.Rptr.2d 1, 5 (Cal.App. 1995).  In the policy of insurance for the Bismarck Mall, the "insured" was Triple Net Properties, LLC and its affiliated, subsidiary, and associated companies and/or corporations.  See Exhibit 2, pg. 7.  V.P. Investments was the owner of the Bismarck Mall at the time of the loss and an affiliated, subsidiary, and associated company of Triple Net, and therefore, also a named insured, as indicated on the Evidence of Property Insurance.   See Exhibit 3, pg. 12.

11

As discussed above, Gateway first contacted Scott deLuise and Matrix to perform public adjusting services for the Bismarck Mall before Gateway even owned the mall. Mr. Arjmand informed Mr. deLuise that he wanted to hire Mr. deLuise because Mr. deLuise was licensed as an insurance consultant in North Dakota and Mr. Arjmand was not so licensed. See deLuise Declaration, ¶ 3. Sometime thereafter, Gateway entered into a contract and purchased the Bismarck Mall. As a part of this purchase, Gateway received an assignment from V.P. Investments of the insurance proceeds for the July 2005 loss and the rights to pursue the insurance claim. See Exhibit B, Gateway Rule 30(b)(6) Deposition, pg.33,ln.10-pg.34,ln.9; deLuise Declaration, ¶ 5. Around that same time, in April 2006, Matrix and V.P. Investments entered into an agreement for Matrix to provide public insurance adjusting services to V.P. Investments for the loss, which Gateway also acknowledged and signed as the assignee of the insurance proceeds. See Exhibit 3, pgs.2-3; deLuise Declaration, ¶ 5. The V.P. Investments agreement with Matrix was appended to and made part of the assignment agreement between V.P. Investments and Gateway for Gateway's purchase of the Bismarck Mall. See Exhibit 3, pgs.5-6.

Thus, it is undisputed that Gateway was not the insured under the Policy which covered the Bismarck Mall under which the insurance claim was made for damages to the Bismarck Mall. Section 15600(b) provides that any contract for services regulated by this chapter that is entered into by an insured with any person who is in violation of subdivision (a) may be voided at the option of the insured. Therefore, even if we assume the California Public Insurance Adjusters Act applies, which Matrix disputes and addresses below, since Gateway was not the insured under the policy of insurance, Gateway cannot claim the contract between it and Matrix is void under California Insurance Code, section 15600(b). Had the Legislature intended the

1  CPIAA to apply to non-insureds who might submit a claim under an assignment from an insured,

2  then the Legislature could have used the word "claimant" instead of the word "insured" when

3  granting the right to terminate a contract with a public adjuster.  Or, the Legislature could have

4  easily just said "anyone" contracting with a public adjuster could void the contract under certain

5  circumstances.  Then, literally anyone could use the provisions of the CPIAA to void a contract.

6  However, the Legislature specifically used the word "insured" and, because of this specific and

7  non-ambiguous term,  this Court must find that only an "insured" under an applicable policy can

8  void a public insurance adjuster contract under the CPIAA.

9      **2.  The California Public Insurance Adjuster Act Does Not Apply to Losses Occurring to Property Outside of the State of California**

10         The language of the CPIAA indicates that it is intended to apply only to public adjusting

11  activities performed in the State of California.  Section 15600(a) states that "no person shall

12  engage in a business regulated by this chapter . . ."  Cal. Ins. Code, §15600(a).  Inherent within

13  this language is that the fact that in order to be "regulated by this chapter," the public adjusting

14  services must be subject to the laws of the State of California.  Clearly, California statutes cannot

15  reach beyond the State's boundaries and attempt to regulate conduct of out-of-state entities

16  performing actions outside of the State of California.  Section 15600 does not specifically define

17  how it is determined where public adjusting services are performed.  Other sections of the

18  CPIAA, however, do suggest that the public adjusting services must actually be performed in

19  California and that the location of the loss should determine where the public adjusting services

20  are performed.  Section 15027(a) of the CPIAA provides that "no licensee shall, directly or

21  indirectly, act within this state as a public insurance adjuster . . ."  Cal. Ins. Code, § 15027(a).

22  Thus, it is clear from this language that the CPIAA only applies to public adjusting activities

23  performed within California.

24

25                                                13

1    Legislative history of the relevant section of the CPIAA indicates it was intended to

2  protect the public from unlicensed individuals performing public adjusting services in California.

3  Specifically, the comments to Assembly Bill 2528 state:

4    Since public insurance adjusters are not hired by the insurer, they must solicit
     clients directly, something that is permitted (and regulated) in existing law.
5    However, because of this, there is a strong potential for abuse by unlicensed
     individuals. Under existing law, a consumer who unwittingly signs a contract with
6    an unlicensed person has, as their only remedy, filing a lawsuit against that person
     in court.
7  California Bill Analysis, A.B. 2578 Assem., 4/22/1998

8  The history of the bill goes on to state that "particularly in times of catastrophe, people claiming

9  to be public adjusters have defrauded both policyholders and insurance companies. The bill

10  would help prohibit that, and to more effectively void contracts written by unlicensed adjusters."

11  California Bill Analysis, A.B. 2578 Assem., 4/22/1998.  Furthermore, in the only case discussing

12  the CPIAA, the court recognized the purpose of the CPIAA was to protect innocent insureds

13  from predatory behavior of unlicensed individuals during times of catastrophe.   In Building

14  Permit Consultants, Inc. v. Mazur,  122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562 (Cal.App. 2 Dist.

15  2004) the court stated:

16    This history demonstrates that the Legislature recognized that insureds would
     often be susceptible to exploitation in the wake of earthquakes, fires, floods, and
17    similar catastrophes and that consumers of public adjusting services needed
     protection. In addition to price gouging and collusion with contractors, the Public
18    Adjusters Act protects California consumers from a number of other abuses
     including high-pressure sales tactics, fraud, and incompetence. To ensure
19    accountability and compliance with professional standards already in place for
     adjusters employed by the insurers, the Legislature included the licensure
20    requirement as a part of the statutory scheme.

21  While Plaintiff recognizes that the court in Mazur did enforce the provision of section 15600(b)

22  allowing the insured to void its contract with an unlicensed public adjuster, the case is clearly

23  distinguishable because the defendant who voided the contract in Mazur was the actual insured

24

25
                                         14

1    under the relevant policy of insurance and the damaged property which was the subject of the

2    insurance loss was located in Los Angeles, California.    In addition, there is no indication in

3    Mazur that any public adjusting services were rendered outside of the State of California.

4         After Matrix initiated this lawsuit against Gateway on February 14, 2008, Mr. Arjmand

5    of Gateway filed a complaint with the California Department of Insurance on March 14, 2008,

6    complaining of Matrix's services for the Bismarck Mall loss.  See Exhibit 95.  Mr. deLuise was

7    contacted by investigators of the California Department of Insurance and provided them with all

8    the information and documents they requested.  See deLuise Declaration, ¶¶ 6 & 7.  On about

9    October 6, 2009, Mr. deLuise received a letter from the California Department of Insurance

10   indicating that the department had determined that it did not have jurisdiction over the contracts

11   and fee agreements between Matrix and Gateway in this matter because the property that

12   sustained the loss and was the subject matter of the dispute was located in North Dakota and that

13   the State of North Dakota would have jurisdiction over the public adjusting activities.    See

14   deLuise Declaration, ¶ 8; Exhibit F, California Department of Insurance Letter.

15        Furthermore, it is undisputed that Scott deLuise, who performed the public adjusting

16   services on behalf of Matrix is the principal owner of Matrix and has been licensed as a public

17   adjuster in the State of California since 1993.  See Exhibit C, Matrix Rule 30(b)(6) Deposition,

18   pg.5,ln.17-pg.7.ln.14.   Matrix is a Colorado corporation with its principal and only place of

19   business in Denver, Colorado.  See deLuise Declaration, ¶ 2.  In addition, Raymond Arjmand,

20   the principal owner of Gateway, is a California licensed public insurance adjuster.  See Exhibit

21   B, Gateway Rule 30(b)(6) Deposition, pg.36,ln.24-pg.37.ln.4. Thus, it is clear that the intent of

22   the CPIAA, which is to protect the California general public who are not knowledgeable about

23   insurance claims from predatory tactics of unlicensed public adjusters would not be served by

24

25
                                                  15

allowing a licensed public adjuster in the State of California to void a contract for public adjusting services with a Colorado entity whose principal is a licensed public adjuster in the State of California and North Dakota, for work that was performed in North Dakota, for an insurance loss that occurred in North Dakota.  Furthermore, even the California Department of Insurance has determined that it does not have jurisdiction over the contracts and fee agreements between Matrix and Gateway because the loss occurred in the State of North Dakota.  Likewise, this Court should find that the California Public Insurance Adjusters Act does not apply to the contracts and fee agreements between Matrix and Gateway nor to the adjusting activities of Matrix for the Bismarck Mall loss in North Dakota.

### 3.  The California Public Insurance Adjusters Act Does Not Apply to This Dispute Under the California Choice of Law Analysis

To the extent that this Court believes a choice of law analysis is needed to determine whether the CPIAA should apply to allow Gateway to void the contract between Gateway and Matrix under the CPIAA section 15600(b), Matrix will address California's choice of law analysis.  However, in doing so, Matrix does not waive its assertion that the CPIAA does not apply on its face because Gateway is not an "insured" under the relevant policy of insurance and the CPIAA and that the CPIAA does not apply to public adjusting services for losses occurring outside of California, both discussed above.

The general principle that, whenever possible, courts should interpret contractual language to uphold the validity of a contract is well recognized.  *See* Walsh v. Schlecht, 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977); Saavedra v. Donovan, 700 F.2d 496, 500 (9th Cir.), cert. denied,464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983).  Moreover, when interpreting a contract, courts should look to the plain meaning a layperson would attach to the

terms of the contract, taking the contract as a whole, in an attempt to ascertain the intentions and reasonable expectation of the parties.  Gravillis v. Coldwell Banker Residential Brokerage Co., 143 Cal.App.4th 761, 774-775, 49 Cal.Rptr.3d 531 (Cal.App. 2 Dist. 2006).  Furthermore, when one party and its attorneys draft a contract which creates an ambiguity as to its terms and conditions, it is axiomatic that ambiguities in contractual language are construed against the drafting party.  See InterPetrol Bermuda Ltd. v. Kaiser Aluminum International Corp., 719 F.2d 992, 998 (9th Cir.1983); Graber v. Engstrom, 384 N.W.2d 307, 309 (N.D. 1986).  Here, the attorneys for Gateway, Schuler & Brown, drafted the agreements between Gateway, Matrix, and Barton.  Exhibit C, Matrix Rule 30(b)(6), pg. 67, ln.19- pg.68,ln,9, pg.125, ln.24-pg.126, ln.14. Thus, any ambiguity as to the terms and conditions of the agreements, like place of performance or which State's public adjuster laws should apply, must be construed against Gateway.

The original public insurance adjusting contract in this matter which was entered into on April 24, 2006, between V.P. Investments and Matrix for public adjusting services, which Gateway also signed, does not identify under what State's laws it should be interpreted, nor do the subsequent agreements between Matrix, Gateway, and Barton which altered the payment methods and amounts owed to Matrix for its public adjusting services. See Exhibits 3 (pg.2-3), 24 & 63.  Thus, any ambiguity in the contracts between Gateway, Matrix, and Barton as to the place of performance must be construed against Gateway since Gateway's attorneys drafted the agreements.

California Civil Code section 1646, originally adopted in 1872, states that a contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.  Cal. Civ. Code, §1646.  Over the years, however, California courts have moved away

1   from the strict application section 1646 and have appeared to start to adopt the judicially

2   fashioned "governmental interest" analysis for determining choice of law issues and the

3   Restatement (Second) of Conflict of Laws, but the continuing existence on the statute books of

4   an older rule leaves lingering tension.  See, e.g., Nestle U.S.A. v. Travelers Cas. & Surety Co.,

5   1998 U.S. Dist. LEXIS 17287, at 6-7 (C.D. Cal. 1998) (Civil Code §1646 is to be "applied in

6   conformity with the new theories of conflicts adopted in California," including the governmental

7   interest test used as the choice of law analysis in California.); Application Group, Inc. v. Hunter

8   Group, Inc., 61 Cal. App. 4th 881 (1998) (applying governmental interest analysis to

9   employment contract and rejecting suggestion that it "mechanically apply"  §1646); Arno v.

10  Club Med Inc., 22 F. 3d 1464 (9th Cir. 1994) (noting some "difference of opinion" about

11  whether §1646 or the governmental interest analysis applied to contractual issues, but refusing to

12  decide the issue).

13      In addition, with regard to certain insurance contracts, California courts have looked to

14  Restatement (Second) Conflict of Laws  §193, which provides that, with regard to "fire, surety

15  and casualty" policies, the "location of the insured risk will be given greater weight than any

16  other single contact in determining the state of the applicable law."  Stonewall Surplus Lines Ins.

17  Co. v. Johnson Controls, Inc., 14 Cal. App. 4th 637, 645 (1993); Ford Motor Co. v. Insurance

18  Co. of North Am., 35 Cal. App. 4th 604, 614 (1995).

19      However, recently a California Court of Appeal has re-embraced Civil Code section 1646

20  and concluded that the governmental interest choice of law analysis did not supplant section

21  1646 choice of law analysis which provides that contracts are to be interpreted according to the

22  law of the intended place of performance.  In Frontier Oil Corp. v. RLI Ins. Co., 153 Cal.App.4th

23  1436, 1450 (Cal. App. 2 Dist. 2007), the court applied Civil Code section 1646 to determine

24

25

where a third party liability policy was intended to be performed.  Even though the policy did not expressly specify the place of performance, the court held that a contract indicates a place of performance within the meaning of section 1646 if the intended place of performance "can be gleaned from the nature of the contract and its surrounding circumstances."  Frontier Oil Corp. v. RLI Ins. Co., 153 Cal.App.4th 1436, 1450 (Cal. App. 2 Dist. 2007).   The court held that California, as the location of the risk insured under the policy, was the state where the insurer would be obligated to perform its defense obligations under the policy, the contracting parties knew this at the time the policy was issued, and the policy included several endorsements reflecting the existence of a covered risk located in California, and therefore, California law governed the interpretation of the policy. Frontier Oil Corp. v. RLI Ins. Co., 153 Cal.App.4th 1436, 1461 (2007).

Under the analysis put forth in Frontier Oil Corp, this Court should determine that the intended place of performance of the contracts between Matrix, Gateway, and Barton can be gleaned from the nature of the contracts, the surrounding circumstances, and the previous contracts between the parties, and that the intended place of performance of the contract must be the State of North Dakota.  The insured property was located in North Dakota, most of the experts, consultants, and contractors wired hired in and performed all their work in North Dakota, and meetings and site visits were regularly held at the Bismarck Mall in North Dakota. In addition, while Gateway has its executive offices located in California, Gateway also has offices in North Dakota at the site of the Bismarck Mall.  See Exhibit B, Gateway Rule 30(b)(6) Deposition, pg.18,ln.20-pg.19,ln.19.   Thus, this Court should not discount the contacts that Gateway itself has with the State of North Dakota and the significant interest the State of North Dakota has in regulating the contract entered into by the parties for a loss that occurred in North

19

Dakota.  Furthermore, Matrix is a Colorado corporation and has its principal place of business in Colorado.  Under the analysis set forth in <u>Frontier Oil Corp.</u>, this Court should glean from the nature of the contracts and their purposes of adjusting a commercial property loss located in North Dakota that the North Dakota insurance consultant laws should apply.

Moreover, many states have public insurance adjuster statutes under which one must obtain a license in order to become a public insurance adjuster, or as in North Dakota, an insurance consultant.  See N.D. Century Code, § 26.1-26-01, et. seq. and specifically, § 26.1-26-02(4) defining an "insurance consultant" as "a person that, for a, holds oneself or itself out to the public as engaged in the business of offering any advice, counsel, opinion, or service with respect to the benefits, advantages, or disadvantages promised under any insurance policy that could be issued in this state."  See Also, Colorado Revised Statutes, §10-2-417.  The various state public insurance adjusting statutes and regulations promulgated under them have various requirements one must meet in order to become a public adjuster and in order to perform public adjusting activities.  Gateway's suggestion that because it is a California corporation the California Public Insurance Adjuster Act should apply to a loss which occurred in North Dakota would circumvent North Dakota's ability to police and regulate insurance consultants within its own state boundaries for insurance losses to property within North Dakota.  Furthermore, since Gateway was not even the insured under the applicable policy of insurance for the Bismarck Mall loss and was only an assignee of the insurance claim by the previous owner and insured, V.P. Investments, as discussed above, the limited contacts with the State of California in this matter for application of the California Public Insurance Adjusters Act is tenuous at best. Likewise, defendant Gateway clearly has significant contacts in North Dakota as the owner of

the mall which was the subject of the insurance claim and Gateway maintains offices in North Dakota.

The only proposed expert testimony on the custom and practice in the industry regarding where a public adjuster needs to be licensed in order to perform public adjusting services is from Matrix's expert, David Young.  Based on his twenty-one years of experience as a pubic adjuster and presidency of the Adjusters Insurance School, Mr. Young is consistently asked by insurers to prove that he is licensed in the state as a public adjuster wherein the loss occurred before he is allowed to proceed with the his services as a public adjuster.  See Young Declaration, ¶ 3, Exhibit E, Young Expert Report, pg. 4.  In addition, Mr. Young has never been asked to show he was licensed in a state other than where the loss was located and he has never encountered a situation where a State other than the State in which a loss is located has exercised any jurisdiction over the public adjusting activities, loss adjustment, or contract of a public adjuster.  See Young Declaration, ¶ 4, Exhibit E, Young Expert Report, pg. 5.

Finally, it would make it virtually impossible for a public adjuster to adjust a loss within a certain state's boundaries unless the public adjuster first determined all possible states which might have any connection to the loss and, thereby using Gateway's logic, could impose its public insurance adjuster's laws on the public adjuster.  If a loss incurred in one state, but the insured entity was incorporated in another state, but had its principal place of business in a third state, how could a public adjuster be expected to comply with the public adjusting laws of all three states if they differ?  In addition, if the insurance company was in a forth state, the insurance company adjusters were in a fifth state, meetings were held in other states and consultants and repair companies were met with and hired from additional states, under Gateway's argument, a public insurance adjuster could be subject to the licensing requirements

1  of numerous states for any one loss and subject to multiple states' laws which could be

2  contradictory and/or impossible to reconcile.  The only logical jurisdiction which should control

3  and regulate the activities of a public adjuster is the jurisdiction in which the property loss

4  occurred.   The state in which the property loss occurred has a much stronger interest in

5  regulating how public adjusters act within its boundaries for losses that occurred within the state.

6  <strong><u>CONCLUSION</u></strong>

7           Thus, because the Gateway was not an insured under the policy of insurance for the loss

8  at the Bismarck Mall in North Dakota, because the California Public Insurance Adjusters Act

9  does not apply to property losses occurring and adjusted outside of the State of California, and

10  because California choice of law analysis would favor the application of North Dakota law to the

11  contracts between Gateway, Barton, and Matrix, this Court should conclude that Gateway cannot

12  elect to void the contracts under California Insurance Code, section 15600(b).

13           Respectfully submitted this 13th day of October, 2009.

14                                                    YATES LAW FIRM, LLC

15                                                    By:  /s/ Phillip J. Frazee
                                                     Phillip J. Frazee, Bar No. 220372
16                                                   pfrazee@yateslawfirmllc.com
                                                     5020 Campus Drive
17                                                   Newport Beach, CA  92660
                                                     Telephone:  (949) 296-7005
18                                                   Facsimile:  (760) 994-0087

19                                                   Russell E. Yates, (Admitted *Pro Hac Vice*)
                                                     ryates@yateslawfirmllc.com
20                                                   1900 Wazee Street, Suite 203
                                                     Denver, Colorado 80202
21                                                   Telephone: (303) 722-2810
                                                     Facsimile: (303) 722-2890
22                                                   ATTORNEYS FOR PLAINTIFF

23

24

25

1

<u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on October 13, 2009, a true and correct copy of the foregoing **Plaintiff's Memorandum of Applicable Law** was filed and served via CM/ECF, as noted, to:

3

4

David Browne
23901 Calabasas Road, Suite 1064
Calabasas, CA 91302

5

*Attorney for Defendant Gateway Fashion Mall, LLC*

6

Tim Milner
Law Offices of Tim Milner

7

501 S. Beverly Drive, Suite 200
Beverly Hills, CA 90212

8

*Attorney for Bob Barton and Barton Consulting*

9

10

    _s/_    Phillip J. Frazee

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23